# United States Court of Appeals

## For the First Circuit

No. 03-1174

UNITED STATES OF AMERICA,

Appellee,

v.

DANA DRAY MCCANN, a/k/a DANNY COMBS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Howard, Circuit Judges.

Bruce Green for appellant.
Cynthia A. Young, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

May 5, 2004

**HOWARD**, **Circuit Judge**.  Following an eight-day trial, a jury convicted defendant Dana Dray McCann (a/k/a Danny Combs and D. Dacques Sonner) of mail fraud, wire fraud, and engaging in monetary transactions in criminally derived funds ("money laundering").  See 18 U.S.C. §§ 1341, 1343, & 1957.  This appeal requires us to decide (1) whether the evidence was sufficient to support the mail-fraud conviction, (2) whether the district court abused its discretion in making two evidentiary rulings, (3) whether it was plain error for a federal agent to testify that, during a non-custodial interrogation, McCann had refused to provide his true name when asked, and (4) whether the court erred in sentencing.  After careful review, we affirm.

## I.

We recite the relevant facts in the light most favorable to the verdicts, see United States v. Echeverri, 982 F.2d 675, 676 (1st Cir. 1993), omitting details extraneous to the issues raised on appeal.

In the late 1990's, McCann moved to Springfield, Massachusetts, where he developed business and personal connections within the Springfield law firm of Winniman & Winniman.  It was through these connections –- particularly, a relationship with Sara Rossman (a paralegal at the firm) –- that McCann was able to obtain access to the firm's accounts, stationery, notary stamps,

signatures, and other items that assisted him in the two fraudulent schemes at issue in this case.

### A.   Scheme #1: The Purchase of the Horse Farm

On April 6, 2000, McCann provided Rossman at Winniman & Winniman a counterfeit $2 million check (purportedly drawn on an Italian bank) and asked her to deposit the check into the firm's trust account.  McCann advised Rossman that he planned to use this money to pay for, _inter alia_, his purchase of a horse farm in Windsor, Connecticut.  Based on these representations, Rossman prepared a deposit ticket and immediately issued to McCann several checks drawn on the trust account, including a $1 million check for the purchase of the horse farm.  Rossman and McCann then traveled together to the firm's bank to deposit the check, but Rossman left to run errands before they reached the teller.  McCann left the bank without depositing the $2 million check.

Later that day, McCann (posing as D. Dacques Sonner, the Chairman of International Land & Livestock) finalized an earlier-agreed-upon purchase of the horse farm by providing Dennis McCormack (an attorney for the seller's trust) with the $1 million check drawn on the Winniman & Winniman trust account.  McCormack advised McCann that the deed would be delivered once the check had cleared.  The following day, McCormack mailed Winniman & Winniman a letter stating that he was depositing the check into the seller's trust account and that he would disburse funds from that account on

-3-

April 12th unless he heard otherwise. Hearing nothing, McCormack thereafter wrote checks on the seller's trust account. When these checks bounced (because the $1 million check never cleared), McCormack immediately phoned McCann, who then promised to straighten out what he alleged was a mix-up at the bank.

Meanwhile, McCann (posing as attorney Danny Combs with Winniman & Winniman) had been in simultaneous loan negotiations with West Coast businessman William Abraczinskas. McCann was seeking from Abraczinskas a quick infusion of approximately $2 million in "show money" -- money needed merely to show the sellers that "Combs's" "client" (i.e., McCann) had the wherewithal to purchase the farm -- that would immediately be repaid, together with $1 million interest. Abraczinskas was told that the "show money" would not be released without his permission and that it would simply remain in the Winniman & Winniman trust account until repaid.[1]

Abraczinskas eventually agreed and, on April 13, 2000, wired $1.56 million to the trust account. The account now being funded (albeit with "show money"), McCann met with McCormack on April 14th and provided him with a $1 million certified check (which McCormack deposited). It was only after McCann had withdrawn the "show money" and received a deed to the horse farm

---

[1]McCann advised Abraczinskas that the "client" was wiring the purchase money from abroad but that the money had not yet arrived.

-4-

that a concerned Abraczinskas, in an effort to protect himself, entered into a purchase-repurchase agreement with McCann. This agreement provided, <u>inter alia</u>, that Abraczinskas was to take title to the farm (and five horses) until McCann repaid the loan. Once payment was received, Abraczinskas would release title back to McCann. Expecting McCann to tender payment and seeking to avoid any tax consequences, Abraczinskas –- who did not want the farm in any event –- did not immediately record the deed and instead accepted McCann's various explanations for the delay.

A few months later, in July 2000, McCann (posing as D. Dacques Sonner) telephoned McCormack and asked for a $200,000 loan to purchase an Arabian horse. Despite having already transferred to Abraczinskas the deed to the horse farm, McCann offered the farm as collateral for the loan. After a subsequent title search revealed that McCann had clear title (recall that Abraczinskas had not yet recorded), McCormack agreed to the loan and promptly recorded the mortgage.

Abraczinskas recorded his deed on August 31, 2000, having never received payment from McCann on the original loan.

**B.   Scheme #2: The Double Assignment of the Mortgage**

On or about April 14, 2000 -- using funds from the $1.56 million wire -- McCann loaned $250,000 to Robert and Edward Allen

-5-

for their purchase of a building in Springfield.[2]  The Allens, in turn, provided McCann with a note secured by a mortgage on the building and agreed to tender monthly payments to Winniman & Winniman.

McCann thereafter proceeded to assign the Allens' mortgage to two different buyers.  First, on May 18, 2000, he assigned the mortgage to Brian David for $175,000, with Winniman & Winniman handling the details.  Under the agreement, the Allens would simply continue forwarding payments to Winniman & Winniman, which would then issue checks to David.  For some reason, David did not immediately record the assignment; according to David, there was a possibility that McCann would buy back the mortgage in a short period of time.

Approximately one month after this assignment, aided by David's failure to record, McCann assigned the same mortgage to Paul Picknelly for $165,000.  Picknelly (through his attorney) immediately recorded the assignment and, on June 21, 2000, mailed to the Allens a letter (the "June 21st letter") notifying them of the change and directing them to make payments directly to him rather than through Winniman & Winniman.  Having received in the interim some payments from the Allens (and perhaps unaware of the

---

[2]The $250,000 check was drawn on the Winniman & Winniman trust account.

-6-

new assignment), Rossman thereafter began making payments to David -- by personal check.[3]

Sometime around July 20, 2000, David (unaware, of course, of McCann's subsequent dealings) received from McCann an undated letter stating that the corporation for which McCann worked had voted to repurchase the mortgage and would accordingly send payment by August 3rd. In early August 2000, a partner at Winniman & Winniman discovered David's unrecorded assignment; after contacting David, the partner immediately recorded the assignment only to learn that the Allens' mortgage had also been assigned to -- and promptly recorded by -- Picknelly.

## C. **Procedural History**

McCann subsequently was tried before a jury on seven counts of a superseding indictment: two counts of mail fraud (see 18 U.S.C. § 1341), two counts of wire fraud (see 18 U.S.C. § 1343), and three counts of money laundering (see 18 U.S.C. § 1957). Following the government's presentation of its case-in-chief, McCann moved for a judgment of acquittal on each count. See Fed. R. Crim. P. 29.[4] The district court granted this motion as to one

---

[3]Although McCann's transaction with David closed in mid-May, Rossman's first check to David was dated July 7, 2000. David testified that, in total, he received two or three payments, with the last payment occurring sometime after his vacation during the last two weeks of August. (This information is relevant to the discussion in Part II. A, below.)

[4]In order to preserve McCann's rights on appeal, the court deemed the motion filed at the close of the evidence as well.

of the mail-fraud counts (a bank's mailing of an insufficient-funds notice to McCormack after he had attempted to draw on the seller's trust account) but denied it with respect to the remaining six counts.

The jury thereafter returned guilty verdicts on five of these six counts: the remaining mail-fraud count (Picknelly's June 21st letter informing the Allens of the assignment); one of the wire-fraud counts (the $1.56 million wire from Abraczinskas to the Winniman & Winniman trust account); and all three money-laundering counts (Abraczinskas's $1.56 million wire transfer, McCormack's delivery of the $1 million certified check for deposit, and the delivery of the $250,000 check to the Allens). A verdict of not guilty was returned on the other wire-fraud count (a call from McCann to Picknelly discussing the terms of the assignment).

On January 9, 2003, McCann was sentenced to 105 months' imprisonment (consisting of concurrent sentences of 60 months for the fraud convictions and 105 months for the money-laundering convictions), a three-year term of supervised release, and $1,895,610.84 in restitution. This appeal followed.

## II.

As noted above, we are presented with four issues on appeal: (1) whether the evidence was sufficient to support the mail-fraud conviction; (2) whether the district court abused its discretion in making two evidentiary rulings; (3) whether it was

plain error for a federal agent to testify that, during a non-custodial interrogation, McCann had refused to provide his true name when asked; and (4) whether the court erred in sentencing.

Given these separate issues, four standards of review apply. First, in deciding sufficiency challenges, "we review all the evidence, direct and circumstantial, in the light most favorable to the prosecution, drawing all reasonable inferences consistent with the verdict, and avoiding credibility judgments, to determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001) (citations omitted); see also United States v. Ruiz, 105 F.3d 1492, 1495 (1st Cir. 1997) (noting that sufficiency challenges are reviewed de novo). Second, where there has been a proper objection below, we review a district court's decision to admit evidence for abuse of discretion. See United States v. Casas, 356 F.3d 104, 113 (1st Cir. 2004); see also Udemba v. Nicoli, 237 F.3d 8, 14 (1st Cir. 2001) ("[A] trial court enjoys considerable discretion in connection with the admission or exclusion of evidence. . . ."). Third, where there has been no proper objection below, we review an evidentiary issue for plain error. See Casas, 356 F.3d at 113. Finally, in reviewing sentencing determinations not involving departures, we first determine the applicability and interpretation of the relevant guideline de novo and then review the court's factual findings for

clear error.  See United States v. Mateo, 271 F.3d 11, 13 (1st Cir. 2001); United States v. Thurston, 358 F.3d 51, 70-72 (1st Cir. 2004).

Mindful of the various standards of review, we turn now to a sequential discussion of the four issues.

### A.  The Mail-Fraud Conviction

"The key elements of the crime of mail fraud, 18 U.S.C. § 1341, are: (1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme."[5]  United States v. Montminy, 936 F.2d 626, 627 (1st Cir. 1991) (citation omitted). Given the arguments raised on appeal, our focus is on the third element.

---

[5]The mail-fraud statute provides, in relevant part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail . . . any . . . matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

-10-

The Supreme Court has explained that, while "the mailing must be for the purpose of executing the scheme, . . . it is not necessary that the scheme contemplate the use of the mails as an essential element." United States v. Maze, 414 U.S. 395, 400 (1974) (citations and quotation marks omitted). Nor is it necessary that the mailing itself be fraudulent; an "innocent" mailing -- i.e., one that contains no false information -- will satisfy the in-furtherance-of requirement so long as it is "incident to an essential part of the scheme" or "a step in the plot." Schmuck v. United States, 489 U.S. 705, 710-11, 715 (1989) (citations omitted). Moreover, the defendant need not himself mail the letter; "[a] mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions." United States v. Serino, 835 F.2d 924, 928 (1st Cir. 1987) (citation omitted). The relevant question is "whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." Schmuck, 489 U.S. at 715.

McCann argues that the district court erred in denying his motion for a judgment of acquittal on the mail-fraud count because, "even when viewed in the light most favorable to the government, [Picknelly's June 21st letter to the Allens] was

[mailed] after the scheme had reached fruition and . . . therefore . . . was not in furtherance of the scheme."[6] Specifically, McCann contends that, because he had already received the proceeds from his double assignment of the mortgage, the evidence was insufficient to establish that the letter served any purpose but to increase the risk of detection.  We disagree.

When entertaining the Rule 29 motion, Judge Ponsor summarized the government's argument (echoed on appeal) regarding the mailing's purpose:

> I think [the government's] argument is that the whole David/Picknelly scam, which we'll call it since we're going to have to take the facts at the moment in the light most favorable to the government, was like a house of cards.  And the letter to the Allens [from Picknelly's attorney] instructing them to begin making their payments to Mr. Picknelly kept that house of cards from collapsing.
>
> It meant that Mr. McCann at this point has got in excess of $300,000, and . . . at a cost of [just] over $20,000 a year, he can keep paying [David].  He can keep paying his cat's-paw, Sara Rossman, the money every month and she can keep sending it to [David] and he can stall for a year on that arrangement and, meanwhile, [the Allens would continue to pay Mr. Picknelly] and the house of cards would not collapse unless Mr. Allen ever ran into Mr. David on the street or Mr. David ever had any conversation with Mr. Picknelly about this.
>
> But it would keep the house of cards from collapsing if the Allens sent their checks to

---

[6]McCann does not contest that he "caused" the letter to be mailed within the meaning of the statute.

>  Picknelly and it would allow [McCann] . . . to buy time in which he could maybe raise enough money to purport to buy the mortgage back from [David] and essentially erase that aspect of the deal through some other, who knows what, source of funds.
>
>  That's I think [the government's] argument. That it lulls, it conceals, it maintains. It props up the house of cards for a little while longer and that that's an important part of what he was doing.

In a nutshell, then, the government's argument is that Picknelly's June 21st letter served the important purpose of decreasing the risk of detection by causing the Allens' payments to be routed in such a way as to keep the scheme running until such time as McCann could devise a way to fix the David problem and perhaps even avoid detection altogether.

Where the evidence supports a finding of such a purpose, the mailing would be within the ambit of the statute. See Schmuck, 489 U.S. at 712 ("[A] mailing that is incident to an essential part of the scheme satisfies the mailing element of the mail fraud offense." (citation and internal quotation marks omitted)); United States v. Lane, 474 U.S. 438, 451-52 (1986) ("Mailings occurring after receipt of the goods obtained by fraud are within the [mail-fraud] statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendant[] less likely than if no mailings had taken place.'" (quoting Maze, 414 U.S. at 403)); United States v. Pacheco-Ortiz, 889 F.2d 301,

-13-

305 (1st Cir. 1989) (post-Schmuck) ("[F]or the mailings to be considered in furtherance of the scheme, the scheme's completion or the prevention of its detection must have depended in some way on the mailings." (citations and internal quotation marks omitted)).

Here, having viewed the evidence and all reasonable inferences in the light most favorable to the verdict, we conclude that there was sufficient evidentiary support for a finding that Picknelly's mailing served the proffered purpose and thus was "incident to an essential part of the scheme." Schmuck, 489 U.S. at 711.

The evidence established that McCann was a clever con artist who ultimately got most of what he wanted by thinking ahead, establishing important relationships, and devising complex and skillful schemes without going overboard. McCann almost certainly knew that, after paying $165,000 for the note, Picknelly (an astute businessman) would be expecting payments from the Allens and would not need a law firm as a go-between. From this evidence, a rational jury could have inferred that McCann intended to take full advantage of the Picknelly situation in order to keep the scheme going strong. Ultimate success meant avoiding detection and Picknelly's reasonably foreseeable letter was a crucial step along that path. By diverting the Allens' payments from Winniman & Winniman to Picknelly, the letter protected McCann from a much-more-risky alternative whereby, month after month, Winniman &

-14-

Winniman would receive two separate claims for a single Allens' check. While the evidence suggests that Rossman might not have been perplexed by this alternative situation, it also supports a finding that others at the firm might have taken note.[7] In any event, with the Allens-Picknelly dealings completely removed from Winniman & Winniman oversight, the only remaining problem would be David -- and that problem easily could be satisfied by small monthly payments from Rossman to David (through McCann's recently padded trust account) until the McCann-to-David assignment could be erased altogether. Indeed, the evidence points to two documents sent to David after the Picknelly assignment -- the July 7th check from Rossman and the undated letter from McCann received in mid-July -- that validate this theory and, together with the other evidence, provide a supportable basis for concluding that Picknelly's June 21st letter was an integral part of the ongoing scheme.

## B. The Evidentiary Rulings

McCann next argues that the district court abused its discretion when it admitted two pieces of "bad character evidence" -- (1) testimony regarding McCann's pledging the horse farm (to

---

[7]It is immaterial to our analysis that, ultimately, an attorney at Winniman & Winniman discovered David's unrecorded note and thereafter recorded it only to find that the same note had already been recorded by Picknelly. Certainly, such a discovery would have only been accelerated if Winniman & Winniman were mailing monthly checks to two assignees of the same mortgage.

which he no longer held title) as collateral for his $200,000 loan from McCormack; and (2) three different bank checks with the same routing number -- in violation of Fed. R. Evid. 404(b) and 403. McCann objected only to the Bank of Belize check; accordingly, the admission of the other two checks is reviewed not for abuse of discretion but only for plain error. See Casas, 356 F.3d at 113. In any event, the court did not abuse its discretion.

Fed. R. Evid. 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of the person in order to show action in conformity therewith." Here, however, for reasons explained below, evidence of the loan from McCormack and the three bank checks was admissible as direct proof of one of two elements of the charged mail-fraud offense, namely (1) the existence of a scheme to defraud, or (2) McCann's knowing and willing participation in that scheme with the specific intent to defraud. Accordingly, Rule 404(b) is not called into play. See United States v. Santagata, 924 F.2d 391, 394 (1st Cir. 1991) ("The documents at issue would tend to make the existence of the scheme to defraud -- a necessary element of the crime charged -- more likely than it would be without the documents. . . . Because the documents were admissible as direct proof of the scheme charged, application of Rule 404(b) was unnecessary." (citations omitted)); United States v. DeLuna, 763 F.2d 897, 913 (1st Cir. 1985) ("Evidence which is probative of the crime charged, and not solely

-16-

uncharged crimes, is not 'other crimes' evidence. Further, where the evidence of an act and the evidence of the crime charged are inextricably intertwined, the act is not extrinsic and Rule 404(b) is not implicated." (citations omitted)).

Evidence of the $200,000 loan from McCormack (which McCann "secured" by the deed to the horse farm he no longer owned) was introduced for the limited, relevant, and specific purpose of refuting McCann's good-faith defense theory -- that, even though Abraczinskas's money was not returned, there was never any real intention to defraud because McCann believed in good faith that the funds for the horse farm would arrive from overseas, and, when they did not, he provided Abraczinskas with the deed to the farm. Because specific intent to defraud was an element of the charged crime and because other evidence suggested that McCann knew that Abraczinskas might not record his deed (due to the potential tax consequences coupled with McCann's asserted interest in repurchasing and accompanying explanations for the delay), the district court supportably determined that the loan evidence was admissible to refute McCann's theory.

Similarly, the district court acted within its discretion in determining that evidence of the three bank checks was admissible. The relevant checks are: (1) an as-of-yet unmentioned "International Land & Livestock" check for $890,000 purportedly drawn on the Bank of Belize, a copy of which McCann faxed to

-17-

McCormack in response to McCormack's request for the horse-farm payment but which (of course) was never deposited into the Winniman & Winniman trust account; (2) the previously discussed $2 million check purportedly drawn on an Italian bank; and (3) a check purportedly drawn on a credit union (found in McCann's home during a lawful search) that shared the same routing number as the other two checks but which was itself never used in the scheme. Obviously, the first two checks were not only relevant to -- but also a part of -- the charged horse-farm scheme. Evidence regarding the third check, though perhaps less probative, still went to two important elements of the government's case (also shown by the other two checks): (1) that there was indeed a scheme to defraud; and (2) that McCann knowingly and willingly participated in it with the specific intent to defraud.[8]  See 18 U.S.C. § 1343.

We next turn to the question whether, despite its probative value, the contested evidence nonetheless should have been excluded under Fed. R. Evid. 403.  That rule permits the exclusion of relevant evidence "if its probative value is

_____

[8]Even if this evidence had not been independently admissible as "part and parcel" of the charged offense, see United States v. Nivica, 887 F.2d 1110, 1119 (1st Cir. 1989); United States v. Taylor, 284 F.3d 95, 103 (1st Cir. 2002), it nonetheless would have been admissible under Rule 404(b).  The contested evidence was being introduced not for the prohibited purpose of showing propensity to commit the charged crimes but rather for permissible -- and specially relevant -- purposes.  See Fed. R. Evid. 404(b) (noting that examples of such permissible purposes include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").

-18-

substantially outweighed by the danger of <u>unfair</u> prejudice . . . ." (emphasis added).  McCann uses but one paragraph to advance his argument:

> Both of these issues tended to cast a bad light upon the defendant.  They both made him appear to be less than honest to the jury. Without this evidence, a reasonable jury could have believed that the Defendant was a business man attempting to make good on a transaction. . . . The extraneous evidence was far more prejudicial to the Defendant's character than it was probative of anything and it was an abuse of discretion to admit it.

In considering the Rule 403 balance, "we will interpose our judgment only if a complaining party can demonstrate that the district court's ruling did not fall within the ambit of reasonable debate."  <u>United States</u> v. <u>Currier</u>, 821 F.2d 52, 55 (1st Cir. 1987) (citations omitted).  In our view, the district court supportably concluded that the danger of unfair prejudice, if any,[9] that resulted from the admission of the loan evidence and three bank checks was substantially outweighed by their probative value (which we have already described).  In any event, viewing the record as a whole, we have trouble seeing how these evidentiary rulings might have been outcome determinative.  <u>See</u> <u>United States</u> v. <u>Tom</u>, 330 F.3d 83, 95 (1st Cir. 2003) ("[E]ven supposing error in admitting

---

[9]Indeed, Judge Ponsor twice instructed the jury that McCann was not being charged in connection with the McCormack loan and that the evidence should be considered only to the extent that it was relevant to the charged scheme surrounding the purchase of the horse farm.

the testimony, it would have been harmless. The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of trial." (citations and quotation marks omitted)). The admission of this evidence is not grounds for upsetting McCann's convictions.

### C. **The FBI Agent's Testimony**

At trial, Special Agent Dominic Barbara of the FBI testified -- without relevant objection -- as follows: (1) that, on August 9, 2000, he and an agent from the Internal Revenue Service went to the horse farm to speak with McCann and serve him with a grand-jury subpoena; (2) that the meeting occurred outside, in a gazebo area on the 100-acre farm; and (3) that, during the interview, McCann answered several questions (including questions about the $2 million check) but refused to provide the agents with his true name when asked.[10]

McCann now contends that "it was plain error affecting substantial rights for [Special Agent Barbara] to testify that [McCann] refused to answer their questions." Specifically, McCann argues (with very little elaboration) that (1) his refusal to answer the agent's what-is-your-real-name question was a valid exercise of his Fifth Amendment rights, and (2) the agent's testimony to this effect was plain error affecting substantial

_____

[10]The IRS agent knew, from McCann's own admission in a prior conversation, that Danny Combs was not McCann's real name.

-20-

rights because "it involved the presentation to the jury of the defendant's claim of Fifth Amendment rights" and served no other purpose but to tarnish his image by "imply[ing] that [he] ha[d] something to hide."  To prevail on this claim, McCann must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  See United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (citations omitted); Fed. R. Crim. P. 52(b).

Here, whether an error occurred -- let alone a "clear or obvious" one -- is far from certain.  In Jenkins v. Anderson, 447 U.S. 231, 238 (1980), the Supreme Court held that "the Fifth Amendment is not violated by the use of pre-arrest silence to impeach a criminal defendant's credibility."  In so holding, the Court expressly refused to consider "whether or under what circumstances pre-arrest silence may be protected by the Fifth Amendment."  Id. at 236 n.2.  We have stated that "application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime."  Coppola v. Powell, 878 F.2d 1562, 1565 (1st Cir. 1989).  But we never have addressed the precise question presented in this case: whether the privilege against self-incrimination is implicated when, in the context of a

-21-

non-custodial interrogation, a suspect selectively refuses to answer a what-is-your-real-name question despite having volunteered answers to other questions that he perhaps believes are less likely to induce an incriminating response.[11] Moreover, the other courts of appeal are split on the question whether, under some circumstances, the Fifth-Amendment privilege against self-incrimination prevents the government from using a suspect's pre-arrest silence as substantive evidence of guilt. Compare Combs v. Coyle, 205 F.3d 269, 283 (6th Cir. 2000) ("[T]he use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination."), United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017 (7th Cir. 1987) ("The right to remain silent, unlike the right to counsel, attaches before the institution of formal adversary proceedings."),[12] and United States v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991) (holding that, under the circumstances,

---

[11]Coppola involved a suspect's pre-arrest refusal to answer all questions as expressed by something more than a simple I-don't-want-to-answer response: "Let me tell you something. I'm not one of your country bumpkins. I grew up on the streets of Providence, Rhode Island. And if you think I'm going to confess to you, you're crazy." 878 F.2d at 1563. We concluded that the admission of this particular statement was in violation of the defendant's Fifth-Amendment rights and was not "harmless error beyond a reasonable doubt." Id. at 1571.

[12]The Seventh Circuit subsequently held that comment is permitted when, as here, the defendant selectively responds to an investigator's questions and thus "start[s] down the self-exculpation road." United States v. Davenport, 929 F.2d 1169, 1174-75 (7th Cir. 1991).

-22-

the court erred in admitting an IRS agent's testimony regarding defendant's refusal to answer any questions during a non-custodial interrogation), with United States v. Oplinger, 150 F.3d 1061, 1067 (9th Cir. 1998) ("[W]e respectfully disagree with the First, Seventh, and Tenth Circuits, which have all held that pre-arrest silence comes within the proscription against commenting on a defendant's privilege against self incrimination[;] [i]n our view, the position those courts have endorsed is simply contrary to the unambiguous text of the Fifth Amendment . . . ." (internal citations omitted)), and United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) ("The government may comment on a defendant's silence if it occurred prior to the time he was arrested and given his Miranda warnings.").[13]

In any event, McCann's claim must fail for a more obvious reason: any error did not affect his "substantial rights." See United States v. Bradstreet, 135 F.3d 46, 50 (1st Cir. 1998) (defining an error that "affects substantial rights" as, in most cases, one that "affect[s] the outcome of the district court proceedings") (citation omitted). Here, as discussed above, there was a wealth of evidence regarding McCann's skillful participation

---

[13]The Supreme Court may soon provide some (indirect) guidance on the identification-question issue: certiorari was granted in Hiibel v. Sixth Judicial Dist. Ct. of Nevada, 124 S.Ct. 430 (2003), apparently to determine whether a state statute requiring the subject of an investigative detention to identify himself infringes the Fifth-Amendment privilege against compelled self-incrimination.

in various schemes to defraud.  This evidence included, <u>inter alia</u>, (1) in-court identification testimony from several witnesses who testified that, over the course of the charged activities, they had known the defendant not as McCann but rather as Danny Combs or D. Dacques Sonner, and (2) documents central to the schemes bearing the signatures of either Danny Combs or D. Dacques Sonner coupled with testimony that the man now identified as McCann had signed those documents.  In short, the evidence connecting McCann to the crimes overwhelmingly suggested that McCann "ha[d] something to hide," and it would be unreasonable to conclude that Special Agent Barbara's testimony provided anything save additional corroboration.

### D.  <u>The Sentence</u>

We turn finally to two proffered grounds for vacating the sentence: (1) "the defendant was [improperly] sentenced with the [2002] version of the guidelines in effect at the time of sentencing instead of the [1999] version in effect at the time of the commission of the crime [thereby] resulting in a longer sentence;" and (2) "the defendant was improperly assessed two points on his criminal history category for being on probation [even though] he subjectively believed that his probation had ended."  We need only address the second claim of error, as McCann withdrew the other at oral argument.

McCann's argument fails because there is nothing in the text of the criminal history provisions that suggests that a defendant's subjective knowledge concerning the sentence he is serving is at all relevant to the determination of his criminal history.[14]  The relevant guideline provides that, in determining criminal history points, the sentencing court should "[a]dd 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation."  U.S.S.G. §4A1.1(d) (2002).  Because the district court had before it evidence that McCann had committed the federal offenses while on probation from a state conviction in Texas, the district court added two points to his criminal history score.  Given the unambiguous and unqualified text of §4A1.1(d), that ends the matter.

---

[14]Neither do the purposes underlying these provisions, as expressed in the Introductory Comments to the criminal history section, support such an assertion.  According to the relevant commentary,

> [a] defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence.  To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered.

U.S.S.G. Ch. 4, Part A (intro. comment.) (2002).

## III.

For the reasons stated above, McCann's convictions and sentence are **<u>affirmed</u>**.