# United States Court of Appeals
## For the First Circuit

No. 15-1108

UNITED STATES OF AMERICA,

Appellee,

v.

ANDREW ZARAUSKAS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron and Stahl, Circuit Judges,
and Sorokin,* District Judge.

Stephen C. Smith, with whom Lipman & Katz, P.A. was on brief, for appellant.
John Emad Arbab, Attorney, Appellate Section, with whom Allen M. Brabender, Attorney, Appellate Section, John C. Cruden, Assistant Attorney General, and the Environment and Natural Resources Division of the United States Department of Justice, were on brief, for appellee.

February 10, 2016

---

* Of the District of Massachusetts, sitting by designation.

**STAHL**, **Circuit Judge**.  Following a jury trial, Andrew Zarauskas was found guilty on charges relating to the illegal importation of narwhal tusks.[1]  In this appeal, Zarauskas contends that the district court erred by allowing, then failing to cure, a series of comments and questions by the prosecutor, which Zarauskas claims violated the Fifth Amendment by drawing the jury's attention to his decision not to testify.  Zarauskas also challenges the district court's admission of records of vehicular border crossings between the United States and Canada, which the government offered to establish that the tusks in question had originated in Canada.  After careful review, we AFFIRM.

## I. Facts and Background

A.    The Tusk Purchases and the Café Vivaldi Interview

Between approximately 2003 and 2009, Zarauskas served as a confidential informant for the United States Fish and Wildlife Service ("FWS"), providing information about individuals engaged in the smuggling of whale teeth and other wildlife contraband.[2] In this capacity, Zarauskas developed a relationship with FWS Agent Andrey Guidera, with whom he spoke on many occasions.

---

[1] Narwhals are Arctic whales.  Known as "unicorns of the sea," they have a long tusk, which is prized by some collectors.

[2] Zarauskas had access to this sort of information because he collected and sold wildlife-related antiques as a hobby.

On February 17, 2010, Zarauskas agreed to meet with Agent Guidera, as well as Guidera's colleague, FWS Agent Eric Holmes, and a Canadian wildlife official. The meeting took place at Café Vivaldi, located in Zarauskas's home state of New Jersey (the "Café Vivaldi Interview"). In initiating the Café Vivaldi Interview, Agent Guidera told Zarauskas that he wanted to discuss the recent conviction of an individual whom Zarauskas had identified to the FWS as illegally trafficking in sperm whale teeth.

In truth, Agent Guidera and his colleagues had a very different reason for initiating the Café Vivaldi Interview. As part of a separate investigation, the FWS had gathered information on Gregory and Nina Logan, a Canadian couple whom the FWS believed to be illegally importing narwhal tusks into the United States. In the course of that investigation, the FWS learned that Zarauskas had purchased some thirty-three tusks from the Logans between 2002 and 2010 and had resold many of them for profit.

The Café Vivaldi Interview, which the parties agree was a voluntary, non-custodial encounter, was recorded with Zarauskas's consent. Although it began amiably, the agents soon confronted Zarauskas with evidence of his dealings with the Logans. Zarauskas was initially evasive, but ultimately admitted to purchasing approximately a dozen tusks from the Logans. Zarauskas insisted, however, that he believed the tusks were sourced not

from Canada, but from a collection in Maine known as the Hildebrant Collection.[3]

At the conclusion of the Café Vivaldi Interview, Zarauskas consented to a search of his home and his computer. Although Zarauskas initially told the agents that he had only two narwhal tusks at his home, Agent Guidera's search uncovered a total of seven, including several hidden in the rafters of Zarauskas's basement. A subsequent search of Zarauskas's computer turned up email correspondence between Zarauskas and Gregory Logan, which suggested that Zarauskas had arranged to submit a series of payments to Logan at a Canadian address.

B.    Zarauskas's Indictment and Prosecution

Zarauskas was charged under a network of treaties, statutes, and regulations that govern the importing and exporting of wildlife. The United States has signed the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"), Mar. 3, 1973, 27 U.S.T. 1087, which aims to protect endangered and threatened species by regulating trade in wildlife specimens and artifacts. See United States v. Place, 693 F.3d 219, 222 (1st Cir. 2012). Species subject to CITES are listed in three separate appendices to the treaty. See CITES art. II.

_____

[3] As we explain, federal law makes it illegal to import narwhal tusks. Zarauskas's defense centered on his purported belief that the tusks had originated in Maine, rather than Canada.

- 4 -

Narwhals are listed in Appendix II, meaning that the export of any narwhal specimen (including a tusk) requires the possession of a special permit.  See id. at art. IV(2); Place, 693 F.3d at 222.

CITES has been implemented in the United States through a series of statutes and regulations.  The Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., makes it a crime "to engage in any trade in any specimens" or "to possess any specimens" in violation of CITES.  16 U.S.C. § 1538(c)(1).  Separately, the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., makes it unlawful "for any person to use any port, harbor, or other place under the jurisdiction of the United States to take or import marine mammals or marine mammal products," unless done in compliance with CITES or another agreement to which the United States is a party.  16 U.S.C. § 1372(a)(2)(B).  Finally, pursuant to regulations promulgated by the FWS, all wildlife specimens must be imported through a designated port of entry, accompanied by an appropriate declaration, and cleared by an FWS officer (the "FWS Regulations").  See 50 C.F.R. §§ 14.11, 14.52, 14.61.

In November 2012, a federal grand jury returned an indictment against Zarauskas, the Logans, and a fourth defendant. Zarauskas was charged with one count of conspiracy to illegally import narwhal tusks into the United States, in violation of the ESA, the MMPA, the FWS Regulations, and 18 U.S.C. § 371; one count of conspiracy to commit money laundering, in violation of 18 U.S.C.

- 5 -

§ 1956(h); two counts of smuggling narwhal tusks into the United States, in violation of the ESA, the MMPA, the FWS Regulations, and 18 U.S.C. § 545; and two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A).

The case against Zarauskas proceeded to trial. Although Zarauskas did not testify, his defense centered on his purported belief that the tusks in question were not imported contrary to law, but rather were obtained by the Logans from the Hildebrant Collection in Maine. On this basis, the defense claimed Zarauskas did not know that the tusks had been brought into the country illegally, as was required to prove an act of smuggling. See 18 U.S.C. § 545 (criminalizing the "knowing" receipt, concealment, purchase, or sale of merchandise "imported or brought into the United States contrary to law"). The jury apparently rejected his defense, returning guilty verdicts on all counts of the indictment. Zarauskas was sentenced to thirty-three months in prison.

We briefly overview several facets of the trial that are of central importance to this appeal. First, Zarauskas contends that the district court erred when it allowed, then failed to cure, a series of statements and questions by the prosecutor regarding the Café Vivaldi Interview and Zarauskas's failure during the interview to deny his involvement in the Logans' tusk smuggling operation. Zarauskas argues that these statements and questions

violated his Fifth Amendment right to remain silent by drawing the jury's attention to his decision not to testify at trial.[4]

Second, Zarauskas contends that the district court erred when it found, over his objection, that the government could rely on the public records exception to the rule against hearsay to admit a series of records of vehicular border crossings between the United States and Canada. See Fed. R. Evid. 803(8). The government used these records to establish that a vehicle belonging to Gregory Logan crossed the border from Canada into Maine at times corresponding to Logan's shipment of tusks to Zarauskas. We consider Zarauskas's two arguments in turn.

## II. The Fifth Amendment

A. Prosecutorial Comment on the Café Vivaldi Interview

We consider first Zarauskas's contention that the prosecutor violated his Fifth Amendment right to remain silent by repeatedly referring to Zarauskas's failure, at the Café Vivaldi Interview, to deny his involvement in the Logans' tusk smuggling operation. Zarauskas draws our attention to four separate points in the trial record, beginning with the following exchange during the prosecutor's direct examination of FWS Agent Guidera, which we refer to as the "Guidera Colloquy":

---

[4] Zarauskas filed a motion for a new trial premised on the alleged Fifth Amendment violation, which the district court later denied. See United States v. Zarauskas, No. 1:12-cr-00188-JAW-04, 2014 WL 4658718 (D. Me. Sept. 17, 2014).

Q:	During the [Café Vivaldi Interview], did the defendant ever say anything like "you're accusing me of something I didn't do here"?

A:	No, he didn't.

Q:	Did he ever raise his voice at you?

A:	He did not.

Q:	Did he ever get mad at you or say that you misunderstood what happened?

A:	No.

Zarauskas next points to comments made by the prosecutor during his closing argument and closing rebuttal. The first comment, which we refer to as "Closing Comment No. 1", occurred during the prosecutor's closing argument:

> It strikes me that when asked by federal agents to be interviewed, a person really has three choices: You can say "no, thank you, I'd rather not talk"; you can agree to be interviewed and tell the truth; [or] you can agree to be interviewed and spin a web of inconsistent statements. You heard the entire interview. You decide which choice the defendant made on February 17th, 2010.

Next, the defense offered its closing argument. As it is relevant to the prosecutor's rebuttal, we recite the following excerpt:

> The government insists over and over that the defendant knew . . . . [B]ut that's not the way this court works. . . . They have to show evidence that he knew. And they have not shown one iota, not one shred . . . that says that [Zarauskas] knew that those tusks were coming from Canada. . . . They've got this conversation in a café. . . . And then the government acts surprised and says you should be suspicious when [the] agents suddenly

- 8 -

spring on [Zarauskas] that he's the focus of the investigation. What's the human reaction? You've got three government agents . . . sitting there suddenly accusing you of being a tusk smuggler. What are you going to do?

Zarauskas next contests portions of the prosecutor's ensuing rebuttal, the first of which we refer to as "Closing Comment No. 2":

> Now, the defendant says there's not one shred of evidence, not one shred, that the defendant knew that these tusks were illegal. Well, if he thought they were . . . legal, why couldn't he give a straight answer? Two hours and nine minutes, not once did he raise his voice or say, "I didn't do what you're saying I did."

Finally, Zarauskas directs our attention to the following excerpt from the same closing rebuttal, which we refer to as "Closing Comment No. 3":[5]

> I would ask you to do the very same thing that [defense counsel] asked you to do. Ask yourself, if you were in that situation where you believed you were being falsely accused, what would you do? What would you say? If [Zarauskas] thought these tusks were from Maine, why did he keep telling the agents that it was perfectly legal to sell narwhal tusks in Canada? They're from Maine. Who cares? If he thought they were from Maine, then why did he tell the agents, "I don't know how [Gregory Logan] got them across the border"?

Zarauskas objected to the Guidera Colloquy and Closing Comment No. 2. However, he did not object to Closing Comment No. 1 and it appears that he did not object to Closing Comment No. 3.

---

[5] We refer to Closing Comment No. 1, Closing Comment No. 2, and Closing Comment No. 3 together as the "Closing Comments".

Zarauskas's argument may be summarized as follows: because the Guidera Colloquy and the Closing Comments focused on Zarauskas's failure during the Café Vivaldi Interview to deny his involvement in the Logans' tusk smuggling operation, their admission improperly drew the jury's attention to Zarauskas's silence at the Café Vivaldi Interview and to his decision not to testify at trial. As a result, the burden was shifted to Zarauskas to disprove his guilt, all in violation of the Fifth Amendment.

B.   Standard of Review

In assessing the appropriateness of a prosecutor's remarks, we employ a standard of review which varies depending on whether the defendant lodged a contemporaneous objection. Where such an objection was raised, our review is de novo. United States v. Rodriguez, 675 F.3d 48, 61 (1st Cir. 2012). If we conclude that the statement was improper, we then review for harmless error. United States v. Azubike, 504 F.3d 30, 38-39 (1st Cir. 2007). If, on the other hand, the defendant did not raise a contemporaneous objection, appellate review is merely for plain error. United States v. Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993).

C.   Analysis

It is a "bedrock" principle that "[t]he Fifth Amendment forbids any comment by the prosecutor on the defendant's exercise of the right to remain silent," id. at 1186, and a prosecutor may not call attention to the defendant's decision not to take the

- 10 -

stand in his own defense. See Griffin v. California, 380 U.S. 609, 615 (1965); United States v. Rodríguez-Vélez, 597 F.3d 32, 44 (1st Cir. 2010) ("[T]he government infringes the defendant's Fifth Amendment rights whenever 'the language used [by the prosecutor is] manifestly intended or [is] of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" (alterations in original) (quoting United States v. Glantz, 810 F.2d 316, 322 (1st Cir. 1987))).

A number of courts have addressed a related, but distinct question. They have addressed whether a prosecutor violates the Fifth Amendment simply by arguing to the jury that a defendant's pre-custodial silence is an affirmative indicator of guilt, even if the jury would not "naturally and necessarily" take the prosecutor's argument to be a comment on the defendant's failure to testify. See Rodriguez, 675 F.3d at 62 n.17 ("[T]he law concerning a prosecutor's use of a defendant's pre-arrest, pre-Miranda silence is, to say the least, unsettled."); United States v. McCann, 366 F.3d 46, 56 (1st Cir. 2004) (noting that the First Circuit has yet to decide "whether the privilege against self-incrimination is implicated when, in the context of a non-custodial interrogation, a suspect selectively refuses to answer a . . . question despite having volunteered answers to other questions

that he perhaps believes are less likely to induce an incriminating response"), vacated on other grounds, 543 U.S. 1104 (2005).

While the First Circuit has yet to stake a position on this issue, other courts of appeals have reached conflicting results. Compare, e.g., United States v. Moore, 104 F.3d 377, 389 (D.C. Cir. 1997) ("[Defendant] is correct that the prosecutor's comment on his pre-trial silence violated his constitutional rights.") and United States v. Burson, 952 F.2d 1196, 1200-01 (10th Cir. 1991) (finding a Fifth Amendment violation where government agents testified about the defendant's refusal to answer questions during a pre-indictment, non-custodial interrogation), with United States v. Rivera, 944 F.2d 1563, 1568 (11th Cir. 1991) ("The government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his Miranda warnings.").

To resolve the split of authority, the Supreme Court granted certiorari in Salinas v. Texas, 133 S. Ct. 2174 (2013). That case involved a claimed Fifth Amendment violation stemming from the prosecution's use of evidence that the defendant had refused to answer certain questions at a non-custodial interview with officers investigating a murder with which the defendant was later charged. Id. at 2178-79. A three-justice plurality opinion authored by Justice Alito, however, concluded that the defendant

could not assert a Fifth Amendment violation because he had failed to invoke the privilege during the interview.[6]  Id. at 2178.

Justice Thomas (joined by Justice Scalia) wrote a concurrence in which he concluded that the Fifth Amendment should "not extend . . . to a defendant's silence during a precustodial interview."  Id. at 2184 (Thomas, J., concurring in the judgment). Thus, read together, Justice Alito's plurality opinion and Justice Thomas's concurrence leave open the question of whether, in line with the Fifth Amendment, a prosecutor may comment on the defendant's pre-custodial silence.

Nevertheless, we leave this question for another day and instead follow a well-worn path by assuming, without deciding, that prosecutorial comment on the defendant's pre-custodial silence violates the Fifth Amendment.  See Rodriguez, 675 F.3d at 62; Rodríguez-Vélez, 597 F.3d at 44; McCann, 366 F.3d at 56-57. We must then determine whether any such violation merits reversal. As we have said, our review varies based on whether the particular question or statement by the prosecutor resulted in an objection.

---

[6] The transcript of the Café Vivaldi Interview makes plain that Zarauskas did not invoke his Fifth Amendment privilege at any point.  Indeed, the district court reached that conclusion in its written order denying Zarauskas's motion for a new trial. See Zarauskas, 2014 WL 4658718, at *10.  Nonetheless, the government has not argued on appeal that Zarauskas may not assert a Fifth Amendment privilege, and thus we deem any such contention waived.

### i. The Guidera Colloquy and Closing Comment No. 2

Zarauskas objected to both the Guidera Colloquy and Closing Comment No. 2. Our review, therefore, is de novo for harmless error. See Rodriguez, 675 F.3d at 61; Azubike, 504 F.3d at 38-39. "The test is 'whether the prosecutor's misconduct 'so poisoned the well' that the trial's outcome was likely affected, thus warranting a new trial.'" Azubike, 504 F.3d at 39 (quoting United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999)). In order to make this determination, we employ a three-part inquiry, asking: (1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court offered a strong and explicit curative instruction; and (3) whether, in light of the strength of the evidence against the defendant, it is likely that any resulting prejudice affected the verdict. See Rodriguez, 675 F.3d at 62.

Our review of these factors compels the conclusion that any error raised by the Guidera Colloquy and Closing Comment No. 2 was harmless. To be sure, in light of his repeated reference to Zarauskas's silence at the Café Vivaldi Interview, the prosecutor's conduct was neither isolated nor unintentional. Cf. id. (characterizing the prosecutor's challenged statements as "isolated and brief").

Nevertheless, the second and third factors favor the government. As an initial matter, at Zarauskas's behest, the

- 14 -

district court offered a curative jury instruction immediately following closing arguments:

> I just want to emphasize one thing that I think is an important point for your consideration . . . . [The prosecutor], during his closing argument, commented on the conversation between the agents and the defendant in New Jersey, and he commented on both what the defendant said and what the defendant did not say.

> I'd like to reiterate just a portion of my earlier instruction . . . . [T]he defendant has the right to remain silent, and Mr. Zarauskas has a constitutional right, in particular, during the course of this trial not to testify, and there should be no inference of guilt, or of anything else, drawn from the fact he did not testify here in court during the course of this trial. I've told you and I again reiterate that for any of you to draw such an inference would be wrong, and it would be a violation of your oath as a juror.

This curative instruction identified the objectionable portion of the prosecutor's closing argument, "and emphasized [Zarauskas's] right not to testify or present evidence." Rodríguez-Vélez, 597 F.3d at 45. Thus, in the event that the Guidera Colloquy or Closing Comment No. 2 led the jury to believe that Zarauskas was under some obligation to take the stand in his own defense, this instruction palliated any potential prejudice.[7]

---

[7] It would have been preferable for the curative instruction to direct the jury to disregard the references to Zarauskas's silence, and to remind jurors that Zarauskas was under no obligation to say (or not say) anything at the Café Vivaldi Interview, but ultimately Zarauskas never requested these instructions, nor objected to their omission. See Sepulveda, 15 F.3d at 1187 n.19 ("A trial court's failure to launch a limiting instruction sua sponte is not reversible error.").

- 15 -

Finally, the strength of the evidence assures that any prejudice resulting from the Guidera Colloquy or Closing Comment No. 2 had no effect on the jury's verdict. As we have described, Zarauskas's defense centered on an attempt to disprove the government's claim that he knew the tusks in question had been imported from Canada, rather than acquired from the Hildebrant Collection in Maine. There was ample evidence to the contrary.

For example, through the testimony of FWS Agent Holmes, the government offered evidence that Zarauskas had sent a number of payments to Gregory Logan at an address in Alberta, Canada. What is more, the government offered evidence suggesting Zarauskas knew that the Logans' source of narwhal tusks was being continuously replenished, undermining Zarauskas's contention that he believed the Logans to have acquired the tusks from the Hildebrant Collection, where one would expect to find a fixed quantity. On this point, Agent Holmes presented the jury with email correspondence in which Gregory Logan told Zarauskas that he was "[l]ooking into three [tusks] we may be able to get [at] the end of May. They are 86 inch[es] and 89 inch[es] and 90 inches." Agent Holmes also told the jury that Zarauskas had purchased approximately thirty-three tusks from the Logans at a total cost of some $85,000. This testimony, establishing the Logans' ongoing acquisition of new tusks, combined with the sheer quantity of tusks

at issue, seriously undermined Zarauskas's claim that he believed the tusks to have come from a single existing collection.

Separately, the government offered evidence that Zarauskas repeatedly attempted to mislead investigators, further undermining his claim that he believed his actions to be legal. For example, during the Café Vivaldi Interview, Zarauskas initially claimed to have purchased only two small tusks from Gregory Logan. Later, after being confronted with evidence to the contrary, Zarauskas admitted to purchasing upwards of a dozen. Zarauskas also initially claimed during the Café Vivaldi Interview that he only had two tusks at his home. Immediately after the interview, however, Agent Guidera's search of the home uncovered a total of seven tusks, including several hidden among the basement rafters.

Evidence of these deceits bolstered the government's case by eroding the credibility of Zarauskas's professed understanding of the source of the tusks and the legality of his actions. In sum, the evidence of guilt was strong and, even assuming that a measure of prejudice survived the district court's curative instruction, any such prejudice was insufficient to "poison[] the well" and affect the jury's verdict. See Azubike, 504 F.3d at 39.

ii.   Closing Comment No. 1 and Closing Comment No. 3

Lacking contemporaneous objections at trial, we review Closing Comment No. 1 and Closing Comment No. 3 for plain error. Sepulveda, 15 F.3d at 1187.  To prevail, Zarauskas must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  McCann, 366 F.3d at 56 (alteration in original) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)).  Our inquiry takes us only as far as the second prong because we conclude that, with respect to both Closing Comment No. 1 and Closing Comment No. 3, Zarauskas has not shown that an error occurred, much less that any such error was clear or obvious.

We begin with Closing Comment No. 1, which Zarauskas maintains constituted a comment on his failure to proclaim his innocence at the Café Vivaldi Interview and, in turn, drew the jury's attention to his decision not to testify at trial.  We read Closing Comment No. 1 differently, not as commentary on Zarauskas's silence at the Café Vivaldi Interview, but rather as commentary on the inconsistency of Zarauskas's statements.

In our view, the prosecutor fairly laid out the three "choices" Zarauskas faced when Agent Guidera asked to meet with him.  Based on these choices, it appears that the prosecutor sought to make clear that Zarauskas had not said "no, thank you" and

- 18 -

declined the interview, which clearly would have constituted commentary on his silence. Rather, the prosecutor suggested that Zarauskas had opted for the third choice, partaking in the Café Vivaldi Interview, but "spin[ning] a web of inconsistent statements" in the process. See Sepulveda, 15 F.3d at 1187 ("[I]n the absence of a contemporaneous objection it seems fair to give the arguer the benefit of every plausible interpretation of [his] words."). Thus, because Closing Comment No. 1 did not call into question Zarauskas's silence at either the Café Vivaldi Interview or at trial, the district court did not commit clear or obvious error in failing to identify and sua sponte remedy this statement.

We likewise conclude that Closing Comment No. 3 did not result in clear or obvious error.[8] We reach this conclusion for two reasons. As an initial matter, like Closing Comment No. 1, Closing Comment No. 3 did not directly or indirectly refer to Zarauskas's silence during the Café Vivaldi Interview. On the contrary, in Closing Comment No. 3, the prosecutor sought to highlight the inconsistency of Zarauskas's statements during the Café Vivaldi Interview with his claimed belief that the tusks in

---

[8] There is some uncertainty in the briefing as to whether the parties believe that Zarauskas objected to Closing Comment No. 3. Our review of the trial transcript suggests that he did not, but even were we to apply de novo review on the favorable assumption that he did, the result would be the same.

question had originated in Maine.  In other words, the prosecutor sought to highlight what Zarauskas said, not what he did not say.

Furthermore, Closing Comment No. 3 cannot be said to constitute plain error when considered in the broader context in which it was offered.  See id. ("In assaying the appropriateness of a prosecutor's remarks, context frequently determines meaning.").  In his closing argument, which immediately preceded the government's closing rebuttal, defense counsel exhorted the jurors to put themselves in Zarauskas's shoes, asking rhetorically, "[y]ou've got three government agents . . . sitting there suddenly accusing you of being a tusk smuggler.  What are you going to do?"  This invited the prosecutor to respond, as he did, by questioning whether Zarauskas's statements at the Café Vivaldi Interview were consistent with a belief that his dealings with the Logans were legal.  See United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003) (finding the "invited response rule" applicable where "[t]he prosecutor's remarks were limited and addressed only the defense counsel's own comments"); see also Rodriguez, 675 F.3d at 65 (declining to find plain error where "the prosecutor merely posed a rhetorical question that mirrored, and directly responded to, the defendant's closing argument").

D.    Conclusion

In our view, the Guidera Colloquy and Closing Comment No. 2 constituted harmless error, and neither Closing Comment No. 1

- 20 -

nor Closing Comment No. 3 resulted in plain error.  Thus, whether we consider the Guidera Colloquy and the Closing Comments individually or collectively, we must reject Zarauskas's claim of a Fifth Amendment violation.[9]

### III. Hearsay

Zarauskas next claims that the district court improperly admitted hearsay evidence.  We review the district court's legal interpretation of a rule of evidence de novo, but its decision to admit or exclude evidence solely for abuse of discretion.  United States v. Lang, 672 F.3d 17, 23 (1st Cir. 2012) (citing United States v. Dowdell, 595 F.3d 50, 70 (1st Cir. 2010)).

The United States Customs and Border Protection ("CBP") maintains records of vehicles that enter the United States through its borders.  These so-called "TECS" reports log, among other information, the license plate of the vehicle, and the date, time, and location of the border crossing.  Over Zarauskas's objection, and pursuant to the public records exception, see Fed. R. Evid. 803(8), the district court permitted the government to introduce TECS reports showing border crossings by a vehicle belonging to Gregory Logan.  The government used the TECS reports to establish

---

[9] Zarauskas has not appealed from the district court's denial of his motion for a new trial.  Had he done so, we would have found that the district court's decision was not an abuse of discretion.  See Glantz, 810 F.2d at 321 n.2.

- 21 -

that Logan's vehicle had crossed the border from Canada into Maine on dates corresponding to Logan's shipment of tusks to Zarauskas.

Federal Rule of Evidence 803(8) exempts from the general prohibition against hearsay certain records or statements of a public office.  See Lang, 672 F.3d at 23.  Nevertheless, Rule 803(8) contains an exception and prohibits the introduction of a public record in a criminal case if the record consists of "a matter observed by law-enforcement personnel."  Fed. R. Evid. 803(8)(A)(ii).  Zarauskas maintains that the district court's admission of the TECS reports violated Rule 803(8) because those reports were comprised of the observations of CBP personnel.

Our cases distinguish "routine, non-adversarial" records from those that are "adversarial" or constitute "contemporaneous observations of crime" by law enforcement.  See Dowdell, 595 F.3d at 70-71.  In Dowdell, we reasoned that routine, non-adversarial records are more reliable than "observations by police officers at the scene of the crime . . . because of the adversarial nature of the confrontation between the police and the defendant in criminal cases."  Id. at 70 (citations omitted).  Accordingly, we permitted the admission of a police booking sheet under Rule 803(8), reasoning that it contained only a "rote recitation" of "ministerial, non-adversarial information."  Id. at 72.

The First Circuit has not yet considered whether TECS reports fall within Rule 803(8) as admissible, non-adversarial

public records.  Nevertheless, the Fourth, Fifth, and Ninth Circuits have each concluded that they do.  See United States v. Cabrera-Beltran, 660 F.3d 742, 753 (4th Cir. 2011); United States v. Puente, 826 F.2d 1415, 1417-18 (5th Cir. 1987); United States v. Orozco, 590 F.2d 789, 794 (9th Cir. 1979).

We agree.  TECS reports bear all of the indicia of non-adversarial public records.  As a matter of course, the CBP collects information about vehicles crossing the border.  See Cabrera-Beltran, 660 F.3d at 750-51.  The act of recording this information amounts to rote recitation, and the information itself, such as the license plate of the vehicle, and the date of the crossing, is quintessentially ministerial and non-adversarial. See Orozco, 590 F.2d at 793 ("[T]he simple recordation of license numbers [by an officer] . . . is not of the adversarial confrontation nature which might cloud his perception.").  We thus have little difficulty concluding that the district court properly admitted the TECS reports pursuant to Rule 803(8).

## IV. Conclusion

For the foregoing reasons, the conviction is AFFIRMED.