**UNITED STATES of America, Appellee,**

v.

**Larry Joseph LeBLANC, Defendant, Appellant.**

No. 98–1647.

United States Court of Appeals, First Circuit.

Heard Jan. 4, 1999.

Decided March 5, 1999.

Wayne R. Foote for Larry Joseph LeBlanc.

Ronald M. Spritzer, Environment and Natural Resources Division, Appellate Section, with whom David C. Shilton and Bruce W. Pasfield, Environment and Natural Resources Division, Appellate Section, Lois J. Schiffer, Assistant Attorney General, and John McNeil, Regional Criminal Enforcement Counsel, Environmental Protection Agency, were on brief for the United States.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

This is an appeal from a sentence imposed under the Sentencing Guidelines, and the issues are peculiarly complicated. Because the criminal charges at issue were resolved by a guilty plea, we draw the facts of the case primarily from the presentence report, the sentencing transcript and various other materials before the district court. *See United States v. Gill*, 99 F.3d 484, 485 (1st Cir.1996).

In March 1993, a Canadian company called City Sales, Inc. ("City Sales") began purchasing a chlorofluorocarbon called CFC–12, popularly known as freon, from a Canadian supplier and shipping it to commercial buyers in the United States. City Sales was then owned and managed day-to-day by Larry J. LeBlanc, who was responsible for negotiating the terms of the freon purchases in Canada and who directed City Sales employees to

arrange for the transportation of the freon into the United States.

During the pertinent period, U.S. law prohibited the importation of chlorofluorocarbons such as freon unless the importer (in this case, City Sales) possessed an "unexpended consumption allowance" for each kilogram of the chemical. 42 U.S.C. § 7671a(a); 40 C.F.R. § 82.4. The United States had instituted restrictions on the importation of certain CFCs in 1990 pursuant to an international treaty (the Montreal Protocol) aimed at phasing out their production and consumption in the interest of global environmental protection. *See* 42 U.S.C. § 7671 *et seq.;* 40 C.F.R. § 82.1 *et seq.*

Suspicious of LeBlanc's actions, Canadian authorities notified LeBlanc in June 1993 that City Sales would not be granted additional CFC–12 export permits until City Sales could prove that it or its U.S. customers had the consumption allowances required to conduct the freon transactions at issue. Nevertheless, LeBlanc instructed his staff to continue selling freon to U.S. consumers, and according to the presentence report, LeBlanc sold more than $800,000 worth of freon to U.S. customers between September 1993 and July 1994. The United States also suffered excise tax losses, 26 U.S.C. § 4681, estimated to be more than half a million dollars, on the freon thus imported.

On April 29, 1997, a federal grand jury indicted LeBlanc on 21 counts. Thereafter, pursuant to a plea agreement, LeBlanc pled guilty to 8 counts of violating the Clean Air Act, 42 U.S.C. § 7413(c)(1), for knowingly causing the importation of freon into the United States without the required consumption allowances, and to 6 counts—covering 6 of the same 8 transactions—of violating 18 U.S.C. § 545, a customs statute, for knowingly bringing into the United States merchandise contrary to law. The remaining counts, involving charges of false representations on customs documents and a catch-all conspiracy count, were dismissed.

The federal probation office's presentence report, the prosecution, and the defendant each took a different view as to how LeBlanc's sentence should be computed. At the sentencing, everyone (including the judge) agreed that the counts to which LeBlanc pled guilty should be "grouped" as "closely related counts" under U.S.S.G. § 3D1.2.[1] We accept the conclusion as plausible on the present facts without independently endorsing it. *See SEC v. Lehman Brothers, Inc.,* 157 F.3d 2, 5 (1st Cir.1998).

Where all counts fall within a single group of closely related counts, the base offense level for the entire group is the highest offense level applicable to any single count or, if the offense level is determined largely by an aggregate amount (*e.g.,* drug quantity), by the level determined after such aggregation. U.S.S.G. § 3D1.3. To make this determination requires a count-by-count calculation. At this point, two different guidelines presented themselves for consideration, LeBlanc having pled guilty to 14 counts comprising offenses under two different statutes.

Environmental violations fall under part Q of the guidelines, and two different part Q guidelines specifically refer to the Clean Air Act provision to which LeBlanc pled. U.S.S.G. §§ 2Q1.2, 2Q1.3. The former applies to mishandling or unlawfully transporting "hazardous or toxic substances" and the latter to mishandling of other environmental pollutants. No one has argued that freon falls into the former category, so we pass by this possibility. Under the latter guideline, the base offense level is 6, subject to various possible upward adjustments (*not* based on amount).

The other pertinent guideline is U.S.S.G. § 2T3.1, which appears in the guidelines part T governing "customs taxes" and which ap-

---

1. Although the probation officer relied upon U.S.S.G. § 3D1.2(d) to justify the grouping of all counts together, that provision groups as closely related those counts that measure harm by amount for purpose of fixing the offense level; it justifies grouping the customs counts (which do measure harm by amount) but not the grouping of the environmental counts (which do not).

However, in this case, all counts reflected harm caused by the same importation scheme and, arguably, were properly grouped together under section 3D1.2(b). In our case, the effect of treating the two sets of counts as one group (as we do) or two is limited. *See id.* § 3D1.4 (prescribing a 1–level increase in the latter case).

plies to "evading import duties or restrictions (smuggling)"; its statutory cross references specifically include 18 U.S.C. § 545, to which LeBlanc pled. This guideline bases the offense level primarily on the amount of the lost customs taxes inflicted as measured by a general tax loss table. U.S.S.G. § 2T4.1. However, because no duty was payable on the importation of freon, LeBlanc's base offense level under the guideline would have been 4, for offenses where "the tax loss did not exceed $100."

After a two-day sentencing hearing, the district court concluded that LeBlanc should be sentenced under the customs tax guideline and associated tax loss table based upon the amount of federal *excise* taxes on freon that the U.S. producers avoided by dealing with LeBlanc. *See* 26 U.S.C. § 4681. The probation officer's report, whose figures are not challenged, stated that the freon involved in the counts of conviction represented $546,000 in lost excise taxes and an offense level of 17 under the standard tax table. The government supported this approach, although it urged use of a larger excise tax figure.[2]

In reaching this conclusion, the district court relied upon application note 2 of the customs tax guideline, which reads in full:

> Particular attention should be given to those items for which entry is prohibited, limited, or restricted. Especially when such items are harmful or protective quotas are in effect, the duties evaded on such items may not adequately reflect the harm to society or protected industries resulting from their importation. In such instances, an upward departure may be warranted. *A sentence based upon an alternative measure of the "duty" evaded,* such as the increase in market value due to importation, or 25 percent of the items' fair market value in the United States if the increase in market value due to importation is not readily ascertainable, *might be considered.*

U.S.S.G. § 2T3.1 app. note 2 (emphasis added). Apparently viewing the excise tax as an "alternative measure" specifically contem-

plated by the application note, the district court declined the government's request to label its assessment a "departure."

Having set 17 as the base offense level, the court reduced the figure by 3 levels for acceptance of responsibility, U.S.S.G. § 3E1.1(a), and refused the government's request to make an upward adjustment for LeBlanc's role in the offense. The resulting offense level of 14 produced a guideline range of 15 to 21 months in prison. The court sentenced LeBlanc to 15 months imprisonment and a $28,000 fine. LeBlanc now appeals, arguing primarily (as he did below) that the environmental offense guideline should have been used to set his sentence.

■ Interpretation of the guidelines presents issues of law subject to plenary review. *See United States v. Lombardi,* 5 F.3d 568, 569 (1st Cir.1993). In this case, we believe that the district court was misled by the government and the probation officer; their common initial resort to the customs guideline to set the adjusted offense level does not comport with the guidelines' provisions and sequences for calculating the offense level or departing from it. Whether the district judge might yet come out at the same place, after following the guidelines and consciously exercising his discretion to depart, is a different matter.

■ Where counts are grouped as closely related, the grouping rules are quite specific: the next step is to determine the highest offense level applicable to any one count among all of the counts thus grouped. *See* U.S.S.G. § 3D1.3(a). For this purpose it is the (partly) adjusted offense level and not the base offense level that controls. *Id.* app. note 1. Here, the base offense level for each of the customs counts was 4 and no specific adjustment was proposed; the offense level for each of the environmental offense counts was 6, even if no specific offense adjustments applied. For this reason alone, the environmental offense guidelines' offense level of 6 represented the controlling offense level,

---

2. The PSR estimated the lost federal excise taxes from all of LeBlanc's illegal imports—not just those in the counts of conviction—to amount to $1.6 million. The probation officer reported but declined to recommend this larger figure and the government does not pursue the issue here.

subject to remaining adjustments and possible departure.[3]

In this case, there is a further and independent reason why this course was required. Quite apart from the grouping rules, the customs tax guideline itself—in the guideline and not the commentary—contains the following cross reference: "If the offense involves a contraband item covered by another offense guideline, apply that offense guideline if the resulting offense level is greater than that determined above [*i.e.*, by the tax table or the default figure of 4]." U.S.S.G. § 2T3.1(c). A common meaning of "contraband" encompasses items "imported into a country against its laws." *Black's Law Dictionary* 322 (6th ed.1990); *cf. Fine v. St. Paul Fire and Marine Ins. Co.*, 567 F.Supp. 1252, 1255–57 (E.D.La.1983).

The district court may well have thought that the base offense level of 17, reached under its "alternative measure" approach approved in application note 2 of the customs guideline, represented the proper comparison with the offense level 6 reached under the environmental guideline. But while application note 2 is somewhat terse, its "alternative measure" language contemplates that it be implemented by a *departure* from the guideline, although one expressly permitted by it (sometimes called a "guided departure"). A close reading of the application note (quoted above) supports the government's concession that the "alternative measure" is to be achieved by a departure. Thus, the controlling offense level after the grouping-rule computation was 6 under the environmental offense guideline, assuming no specific offense adjustment.

But why, someone might ask, should the comparison be made of offense levels *before* possible departures rather than afterward? The short answer, but not the only one, is that the guidelines so instruct. This is explicit in the grouping guideline which provides that, in determining the highest-level count, "[t]he 'offense level' for a count refers to the offense level from Chapter Two after all adjustments from Parts A, B, and C of Chapter Three." U.S.S.G. § 3D1.3 app. note 1. And, in the sequence of steps prescribed for application of the guidelines, *id.* § 1B1, departing (under part K of chapter 5) comes only at the very end of the process after the offense level is established.[4]

The longer answer is fundamental to the departure concept embodied in the guidelines. The idea, simply put, is that the adjusted offense level and criminal history computed under the guidelines create a presumptive, deliberately narrow range or baseline for the sentence; in the interest of equal treatment, most defendants sharing these pertinent characteristics will get a sentence within the range. And departures will have to be considered, justified, and subject to appeal as departures *from that baseline* which otherwise must apply to offenses within the "heartland" represented by the prescribed guideline range. *See United States v. Rivera*, 994 F.2d 942, 949–50 (1st Cir. 1993).

The government has written an able brief in support of its view that the district judge properly resorted to the customs guideline at the outset and erred only in failing to call his ultimate decision a departure. But its technical parsing of the guidelines is not persuasive: it misreads the grouping rules (*see* note 1, above); and it violates the directive that a prescribed comparison of offense levels within the grouping rules or as between different guidelines means the initial adjusted offense levels and not the levels computed *after* de-

---

**3.** The guidelines do not expressly resolve the issue of computing the combined offense level for a single group of closely related counts only *some* of which are weighted by amount. Our intuition is that one would first find the sum for the latter counts under section 3D1.3(b), and then if those counts were (as here) closely related to other counts not weighted by amount, select the highest figure under section 3D1.3(a) by comparing that "summed" offense level for the weighted counts with the level for each of the remaining unweighted counts. *Cf. United States v. David*, 940 F.2d 722, 741–42 (1st Cir.1991). Here, the result is the same either way: the summed offense level for the weighted counts is still only 4, because 6 "losses" of zero still total $100 or less.

**4.** *See United States v. Rostoff*, 53 F.3d 398, 412 (1st Cir.1995); *United States v. Diaz–Villafane*, 874 F.2d 43, 47–48 (1st Cir.), *cert. denied*, 493 U.S. 862, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

parture. U.S.S.G. §§ 1B1, 3D1.3, app. note 1.[5]

The government's broader argument is that it would be absurd to punish LeBlanc under the environmental guideline based on an offense level of 6 when that guideline is not correlated with quantity and is ill-adapted to measuring the full range of harms caused by LeBlanc's scheme. But that is a possible reason for a departure (which might take the judge back to the tax table as a useful analogy) and not a reason for bypassing the steps, or distorting the concepts, that underlie the guidelines and must be followed uniformly in many different contexts.

In this case, a departure could readily be justified. Even if the customs and environmental offenses are grouped as closely related, they fail to account at all for a third threat to the public caused by LeBlanc's conduct: namely, a loss of revenues through excise tax losses. A departure on this ground is not an end-run around the remarkably lenient grouping rules. The excise tax loss was not reflected at all in the offense level under either the environmental offense guideline or the customs guideline.[6]

Further, the environmental harm in this case itself may be outside the heartland of its guideline, making it an "atypical" case. *Diaz–Villafane*, 874 F.2d at 49. Unlike the ordinary "mishandling" of pollutants, for which 6 is the base offense level, LeBlanc's offense may have disrupted, if only at the margin, a major program designed to deal with a world-wide threat of stratospheric ozone depletion. The problem is not the specific release of LeBlanc's freon—which might otherwise have occurred in Canada— but the tendency of such smuggling to undermine the incentive structure for American industry to switch to new, less threatening substitutes.

As the government explained at LeBlanc's sentencing hearing, a flood of relatively inexpensive, black market freon in the United States may have hampered the creation of markets for the more expensive replacement products U.S. industry has developed. Of course, calibrating this harm is much more difficult than using the tax loss table to measure the excise tax loss. Departures are discretionary, and the district judge is free to depart solely to take into account the fiscal loss which is easily calibrated and more easily justified as a departure.

LeBlanc has offered an ingenious reason for objecting to the use of the tax loss table even as a measure of fiscal loss. He points out that the table is primarily directed to wilful tax evasion, which involves a scienter element that (put very loosely) involves a conscious effort to cheat the government on taxes. See U.S.S.G. § 2T1.1. Indeed, the absence of such a motive led us to sustain a downward departure in a case where the applicable guideline literally called for use of the tax loss table. *United States v. Brennick*, 134 F.3d 10, 14 (1st Cir.1998). LeBlanc says that there is no proof that he intended to evade, or assist others in evading, excise taxes at all.

This may be so, but the table is pertinent here merely to help the district court to measure a reasonable departure, if the judge wants to depart. While LeBlanc may not have wilfully intended to deprive the government of taxes, his wilfulness in violating the environmental statute seems apparent from June 1993 onward; other lost excise taxes were disregarded (see note 2 above); and (as noted above) the tax table ignores other harm done by LeBlanc to the CFC regime that may well be outside the heartland of the environmental offense guideline. On balance, the tax loss table may be generous to

**5.** It is true that a "guided departure" is closer to an adjustment than an unguided one, but is still a departure, discretionary but subject to review, rather than a built-in (mandatory) adjustment— unless and until the Commission decides to make it an adjustment. See *United States v. Cali*, 87 F.3d 571, 577 (1st Cir.1996).

**6.** See U.S.S.G. § 1B1.3 app. note 5 ("When not adequately taken into account by the applicable offense guideline, creation of a risk [of harm]

may provide a ground for imposing a sentence above the applicable guideline range."), *citing* U.S.S.G. § 5K2.0 (policy statement on departures). See also *United States v. Fuentes–Vazquez*, 52 F.3d 394, 396–97 (1st Cir.1995) (harm not adequately accounted for by applicable guideline may be grounds for departure); *United States v. Pelkey*, 29 F.3d 11, 14–15 (1st Cir.1994) (same).

LeBlanc, and its use here surely would not be "unreasonable." 18 U.S.C. § 3742(f); *Cali,* 87 F.3d at 581.

In one sense, a remand may be a waste of time. The district judge obviously preferred the "alternative measure" that produced after adjustment an offense level of 14; nothing obliged him to adopt it. His preference may not be changed by calling it a departure or by appreciating that, absent a departure, the governing offense level would effectively be computed under the environmental offense guideline. The government claims that several district courts have used the excise tax calculation in freon cases, and the government professes to endorse the general approach.

Nevertheless, the likelihood and lawfulness of a similar result does not let us depart *for* the district judge. The initial decision to depart must be made by the district judge, appreciating that a departure is what is involved. Still, it may ward off a further useless appeal for us to repeat that on the present facts a departure would be permissible and that a departure to an adjusted base offense level of 14 would not strike us as unreasonable, if the district judge chose to impose it.

The sentence is *vacated* and the case is *remanded* for re-sentencing in accordance with this opinion.