# United States Court of Appeals
## For the First Circuit

No. 11-1246

UNITED STATES,

Appellee,

v.

DAVID L. PLACE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

J. Martin Richey, Federal Defender Office, for appellant.
Robert G. Dreher, Acting Assistant Attorney General, Environment & Natural Res. Division, with whom Gary Donner, James B. Nelson, and Allen M. Brabender, Attorneys, U.S. Dep't of Justice, Environment & Natural Res. Division, were on brief, for appellee.

August 21, 2012

**THOMPSON, <u>Circuit Judge</u>.**

> But still another inquiry remains . . . whether Leviathan
> can long endure so wide a chase, and so remorseless a
> havoc; whether he must not at last be exterminated from
> the waters, and the last whale, like the last man, smoke
> his last pipe, and then himself evaporate in the final
> puff.

> Herman Melville, <u>Moby Dick</u>.

David L. Place appeals his convictions for illegally trafficking in sperm whale teeth and narwhal tusks. Specifically, a jury found that Place's whale-tooth dealings violated CITES, an international compact implemented in the United States via the Endangered Species Act (ESA) and regulations authorized by the ESA.[1] But Place says the district judge should have instructed the jury on certain lesser-included offenses because he did not actually know his transactions were illegal, even if he should have known. He also says his smuggling convictions are legally wrong because his conduct violated only regulations, not statutes. We disagree with both lines of argument and therefore affirm.

## I. Facts and Background

### A. Trafficking in Whale Teeth

For decades, David Place sold various antiques, artifacts, and Nantucket-related paraphernalia from a shop on the island and,

---

[1] CITES stands for the Convention on International Trade in Endangered Species of Wild Flora and Fauna, March 3, 1973, 27 U.S.T. 1087; relevant implementing provisions of the ESA may be found at 16 U.S.C. §§ 1537A, 1538(c)(1); and the Department of Interior regulations further implementing CITES may be found at 50 C.F.R. §§ 23.1-23.92.

beginning in the 1990s, over the internet. An apparently lucrative element of Place's business was selling scrimshawed narwhal tusks and sperm whale teeth – that is, teeth carved with images and designs – to wealthy Nantucket tourists eager for a piece of the island's whaling history. He also sold uninscribed, or "raw," teeth to local scrimshanders – artisans who would then carve designs into the teeth. Place frequently obtained tusks and teeth – both scrimshawed and raw – over the internet and turned them around for a healthy profit.

On August 7, 1999, Place received an email from Tim Balda (apparently a friend of his) informing Place that "Federal Fish and Game" (apparently the United States Fish and Wildlife Service) had confiscated a narwhal tusk from him because he did not have "all the documentation required for it," and that "[t]heir view is that ALL interstate transport of endangered species parts is illegal. Old or not, scrimshawed or not." Balda said Fish and Game had elected not to indict him but that they could: "The fine for the narwhal tusk could have been as high as $30,000 with a 5 year jail term attached to it. Whale teeth are not much better in the punishment department." Place responded to Balda: "Thanks for the note . . . . I think the time has come to just do private selling . . . as I don't think anyone wants to go to prison or lose their shirts for the sake of a few sales."

Place indeed pursued his "private selling" (which we will discuss only generally because the details of each individual transaction are not at issue here). He tracked down suppliers: Jake Bell, a native of Connecticut who shipped the whale teeth from Ukraine to a friend in the states whom Place had to meet in person to pick up the teeth[2]; Greg Logan, a retired Canadian Mounty who would bring narwhal tusks across the border when visiting his summer home in Maine; and Andrei "Andy" Mikhalyov, a Ukraine-based dealer who acquired teeth from local private collections and sold them to various overseas customers. Place also found buyers: Nantucket scrimshanders and tourists; an internet customer named Bill Feeney, who bought 39 pounds of sperm whale teeth; and various auction-winners on eBay, where he listed his wares surreptitiously (in Place's words, "[n]ever actually state what they are" but instead say "they are a nice ivory color" and "a whale of a deal").[3]

Over the course of these purchases and sales, Place occasionally referenced his awareness that he was breaking the law

---

[2] Receipts for the purchase of teeth from Bell listed the purchased items as "paintings," not teeth.

[3] Place regularly had whale-tooth auctions shut down by eBay on the ground of illegality; his obfuscatory efforts were a response to these shutdowns. It is also worth noting that the shutdown notice from eBay included the following admonishment: "The export/import of marine mammals typically requires CITES as well as other state and/or federal permits. Users should contact the U.S. Fish & Wildlife Service and/or National Marine Fisheries Service before importing or exporting marine mammal products."

by ignoring permits required by CITES. For example, on May 17, 2001, Place sent an email to Nina Logan, who'd transacted in narwhal tusks with him: "next time we do this I would like to get whatever documents I can certifying that these were taken legally, but for now I have managed without." On May 26, 2002, he had another exchange with Logan:

> **Place**: ". . . everytime I mention the tusks to anyone they want to know if they have papers."
>
> **Logan**: ". . . your customers are very correct in requesting supporting documentation . . . ."
>
> **Place**: "I can still sell them without papers to other customers, but it would be wonderful if everything were above board with papers, if you know what I mean!"

Around the same time, Logan referred Place to another narwhal-tusk seller, Ryan Bartlett, who emailed Place: "You are no doubt familiar if dealing in ivory items of this nature one must have documentation – this is where the problem arose as I am unable to provide any formal documentation . . . . I truly do not wish to create a situation where someone becomes the focus of an investigation or worse." To that, Place replied: "I have a customer who could care less about papers and other customers who require them. . . . I still wish to go ahead with this." And so he did.

**B. CITES, the Lacey Act, and the Smuggling Statute**

The papers Place disregarded were indeed necessary for trade in sperm whale teeth. CITES, again, is a treaty that the vast majority of countries, including the United States, have entered into.[4] CITES places different levels of protection on different species, divided into three Appendices: Appendix I provides the highest level of protection for the most critically endangered species, including sperm whales; Appendix II is the intermediate level and includes narwhals. CITES art. II(1); 50 C.F.R. § 23.4(a) (2007) (Appendix I); CITES art. II(2); 50 C.F.R. § 23.4(b) (2007) (Appendix II). Appendix III is not at issue here. Among other restrictions, an export permit is required for international trade in specimens of species from either Appendix I or II, CITES arts. III(2), IV(2); 50 C.F.R. §§ 23.12(a)(1), 23.12(a)(2), 23.15 (2004),[5] and an import permit is additionally required for trade in Appendix I species, CITES art. III(3); 50 C.F.R. § 23.12(a)(1) (2004). Further, CITES places an absolute ban on international trade in Appendix I species for "primarily commercial purposes." CITES art. III(3)(c); 50 C.F.R. § 23.15(d)(7) (2004).

In the United States, CITES has been implemented by the ESA.

_____

[4] For a list of member countries, see CITES Member countries, http://www.cites.org/eng/disc/parties/index.php (last visited July 26, 2012).

[5] The CITES regulations were rewritten in 2007; Place's conduct was governed by the pre-2007 regulations.

-6-

16 U.S.C. §§ 1537A, 1538(c)(1).  16 U.S.C. § 1537 authorizes the Secretary of the Interior to do all things necessary and proper to implement CITES; under this authority, Interior has promulgated regulations.  See 50 C.F.R. §§ 23.1-23.92.  Each of the CITES provisions mentioned above has been re-codified in these domestic regulations (as cited above).  This means it is and has been abundantly clear that international trade in sperm whale teeth and narwhal tusks requires an export permit, and international trade in sperm whale teeth requires an additional import permit and cannot be for primarily commercial purposes.[6]

Two statutes criminalize violations of CITES and its domestic counterparts.  The Lacey Act creates two levels of criminality: any person who transports, buys, or sells wildlife in **knowing** violation of any law, treaty, or regulation – including CITES, the ESA, and the CITES regulations – is guilty of a felony; any person who transports, buys, or sells wildlife that he **should have known**

---

[6] Place's overarching theory of the case is that he did not know his conduct was illegal but instead believed that old, scrimshawed, and Inuit-origin whale teeth were exempt from regulation.  On appeal, his counsel explains this belief further (while conceding that it is "mistaken"): under the heading "Exceptions," 16 U.S.C. § 1539(f) allows the Secretary of the Interior to issue trade permits for raw and scrimshawed teeth taken before 1973; § 1539(e) allows subsistence whaling by Alaskan natives.  Neither of these provisions even arguably applies to Place, who is not a native Alaskan (or at least nothing in the record suggests he is) and who never sought a permit from the Secretary of the Interior; instead, the very fact that Place was aware of these completely inapplicable statutory "Exceptions" cuts in favor of the jury's determination that he knew what he was doing was illegal.

violated a law, treaty, or regulation is guilty of a misdemeanor. 16 U.S.C. § 3373(d)(1)-(2). The smuggling statute (titled "Smuggling goods into the United States") imposes criminal sanctions on anyone who "receives, conceals, buys, [or] sells . . . merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law . . . ." 18 U.S.C. § 545.

### C. Customs Bust at JFK Airport & Investigation

Back to the facts: in February 2004, government agents intercepted a shipment of 548 sperm whale teeth (listed in shipping documents as "tooth of white whale," undoubtedly a reference to fictional sperm whale Moby Dick) from Mikhalyov to James Saunders, who essentially acted as U.S.-based distributor for Mikhalyov. As agents combed through Mikhalyov's and Saunders's records, they found that Place had purchased sperm whale teeth from both men between 2002 and 2004. Consequently, the government turned its attention to Place.

In the meantime, Mikhalyov, Saunders, and Place exchanged a flurry of emails. Saunders sent a message noting that even items that fell under CITES's "exceptions" generally required permits. After Place professed ignorance in a brief email, Saunders sent another email apologizing for the first and blaming the whale teeth's courier for the lack of documentation. Place sent an email wondering why he was not receiving permit papers if the couriers

were supposed to be dealing with paperwork; he followed that by asking about another shipment of teeth due to him. Saunders asked what kinds of teeth were legal to import; Place disclaimed any knowledge. Place asked again for CITES paperwork. Mikhalyov bypassed the CITES question and said he would send more teeth to Place without involving Saunders; he said he would be careful to use small packages marked "souvinirs[sic]/carving/lapidary material or antique ornaments." Place agreed, and things appeared to settle down for a while.

Then on March 8, 2007, Special Agent Troy Audyatis from the National Oceanographic and Atmospheric Administration (NOAA) and two other officers visited Place at his home on Nantucket. They interviewed Place for three hours, resulting in a handwritten sworn statement from Place that he believed "raw teeth without documents must be 100 years old for importation. Scrimshawed teeth must be 1972 or older for import. Any native peoples (Inuit) pieces of any sort are exempt from import restrictions." This asserted (and plainly wrong; see footnote 6 above) belief is the main basis for Place's defense.

### D. Charges, Trial, Conviction, and Appeal

Despite his claimed lack of knowledge, Place was indicted on nine counts related to illegal trafficking in whale teeth.[7] He

---

[7] For reference, the counts are as follows:

1.  Misdemeanor conspiracy with Mikhalyov to commit

remained adamant that he did not know this trafficking was illegal, took his case to trial, and testified at length. At trial, he repeated his belief that old, scrimshawed, and native teeth were exempt from regulation. But he also testified, e.g., that in his dealings with Mikhalyov, Mikhalyov was supposed to "handle all the documentation"; that to be legal his purchases needed "paperwork"; and that Mikhalyov "never did" provide that paperwork. He further testified that he told Bell he "just want[ed] to make sure everything [wa]s legal," to which Bell responded "Oh, yes. I've got all the documentation"; however, he never received paperwork from Bell either. And he testified that he "probably" told Logan not to mark any narwhal-tusk packages as "narwhal" out of concern that the packages would "get held up" at Customs. Finally, Place testified that he had read a notice from eBay shutting down one of his auctions and informing him that "export/import of marine mammals typically requires CITES as well as other state and/or

Lacey Act violations, 2001-2004.
2. Misdemeanor Lacey Act violation based on the spring 2004 shipment seized at JFK Airport.
3. Felony Lacey Act violation based on the sale of 39 pounds of teeth to Bill Feeney in spring 2004.
4. Felony Lacey Act violation based on the purchase of whale teeth from England via eBay in spring 2004.
5. Felony Lacey Act violation based on the purchase of whale teeth from England via eBay in fall 2004.
6. Felony conspiracy with Jake Bell to violate the Lacey Act and the smuggling statute, 2004-2007.
7. Felony Lacey Act violation based on a fall 2004 purchase from Bell.
8. Smuggling whale teeth from Bell, 2005-2006.
9. Smuggling narwhal tusks from Logan, 2005-2006.

federal permits," which prompted him to call eBay for clarification.

After both sides had finished presenting evidence – and two days after the court-imposed deadline for submitting proposed jury instructions – Place moved for a lesser-included-offense instruction. The requested instruction would have allowed the jurors, if they could not agree that Place knowingly violated the CITES permitting requirements, to consider a misdemeanor (should-have-known) Lacey Act violation in addition to each felony charge,[8] but the district judge took the matter under advisement and eventually charged the jury without mentioning the lesser included offenses.

The jury convicted Place on all counts but the second (the misdemeanor Lacey Act violation stemming directly from the JFK bust). The district judge sentenced him to 33 months in prison followed by 24 months' supervised release, as well as a $725 special assessment. Place now appeals his convictions on counts 3 through 9; he does not challenge his conviction on count 1.

## II. Analysis

### A. Requested Jury Instruction

Place first takes issue with the district court's decision not to give his requested instruction on misdemeanor Lacey Act violations. Before considering this issue on the merits, though,

---

[8] The felony Lacey Act counts were 3, 4, 5, 6, and 7.

we must address the government's argument that Place waived the jury-instruction issue by raising it late below. Jury-instruction requests are governed by Federal Rule of Criminal Procedure 30, which says any such "request must be made at the close of the evidence or at any earlier time that the court reasonably sets." To determine whether Place complied with this rule and adequately preserved the jury-instruction issue, we must take a close look at what happened below.

At 2:54 pm on November 16, 2010 – day five of trial – the district judge told the parties "if there are to be any offerings of proposed verdict forms and/or supplemental instructions to the jury, we will need them by the close of business today." Both sides accordingly filed proposed supplemental instructions later that day; the government followed with another set of supplemental instructions the next day; and Place followed with yet another set – the ones discussing lesser-included misdemeanor Lacey Act violations[9] – the following day at lunch, just after the close of evidence and before the charge conference.

---

[9] Specifically, Place's proposed supplemental instructions would have charged the jury as follows: "[I]f, after reasonable efforts, you are unable to reach a verdict, you should go on and consider whether the government has proved beyond a reasonable doubt that Mr. Place is guilty of the lesser offense of a misdemeanor-level violation of the Lacey Act." The instructions went on to explain that "[i]nstead of proving beyond a reasonable doubt that David knew that the wildlife was possessed, sold, or transported" illegally, "for a misdemeanor-level violation the government must prove beyond a reasonable doubt that David Place, in the exercise of due care, should have known that the wildlife in question was possessed, sold, or transported" illegally.

At the charge conference, the various proposed instructions were minutely dissected and discussed in great detail; the lesser-included request came up at the end. The judge said, "It's a little late, Ms. Fried [Place's attorney], to be submitting things that I've been inviting for the whole trial. But go ahead. I'll allow you to orally argue this." Place's attorney repeated the substance of the request: "We're asking for lessers to be given on the felonies – the felony Lacey Acts. We're asking for misdemeanor lesser included which have this different standard of knowledge." The government pointed out that "[i]n the defendant's own pleading, it states that lesser includeds can be given if the jury has been unable to reach a verdict on the greater charge after reasonable efforts," and asked that the court "wait on" the issue (suggesting that the court only provide the instruction if the jury ended up hung on the felony Lacey Act counts). The government then added that "there has been ample evidence submitted of the defendant's knowledge." Just before breaking, Place's attorney repeated, "It's just that – I guess it's our position that we're entitled to any lessers that are included within a greater offense because, obviously, if the government's position is that the evidence supports the greater offense, it also supports the lesser." "All right," the judge said, "I'll take that matter under advisement."

The next day the judge charged the jury without mentioning the lesser-included instruction Place had requested. At sidebar after

the charge, Place's attorney listed objections to the instructions, advancing detailed arguments as to some but saying of the lesser-included issue only this: "We also object to the Court's failure to give our request for lesser included offenses." And that was that.

This exchange lends itself to a spirited debate as to whether the lesser-included instruction issue was forfeited. Place's request came two days after the judge asked for it, so it may have been untimely under Rule 30, see United States v. Upton, 559 F.3d 3, 8-9 (1st Cir. 2009), and it arguably left inadequate time for the government and the judge to look over the proposed instruction before the charge conference. Moreover, on a somewhat different note, it is puzzling that Place would wait so long to spring his lesser-included offense argument on the government and the court, given that the argument closely tracks Place's entire theory of the case (that he lacked actual knowledge that his actions were illegal). All that said, there are some factors that suggest Place has preserved the issue: the judge originally gave the parties only two hours' notice of the deadline for filing supplemental instructions, and Place filed the instructions arguably at the close of evidence, which might mean the filing technically complied with Rule 30 (if we were to say the original notice of two hours was not reasonable, as the Rule requires). And the parties give us plenty of material to work through the jury-instruction argument on appeal.

In the end, though, we need neither rescue this precarious set of circumstances from the brink of forfeiture nor shove it over the edge, because the district court simply did not err in failing to give the requested instructions; therefore, whether the review is de novo (as it would be if the issue were preserved, United States v. Flores, 968 F.2d 1366, 1367-68 (1st Cir. 1992)) or plain error (as it would be if the issue were forfeited, Upton, 559 F.3d at 9), the result is the same.  Our analysis follows.

Counts 3, 4, 5, 6, and 7 charged felony violations of the Lacey Act.  The Lacey Act, again, involves two levels of criminality: a defendant who transports, buys, or sells wildlife in **knowing** violation of any statute or treaty is guilty of a felony; a defendant who transports, buys, or sells wildlife that he **should have known** violated a statute or treaty is guilty of a misdemeanor. 16 U.S.C. § 3373(d)(1)-(2).  Place argues that a jury reasonably could have found him guilty only of misdemeanor Lacey Act violations, and that he was therefore entitled to a jury instruction on these lesser included charges.  The government responds that evidence of Place's actual knowledge of criminality was overwhelming, and therefore that the district court was right to instruct the jury only on the felony violations.

A criminal defendant is entitled to a jury instruction on a lesser included offense if (1) the lesser offense is necessarily included in the charged offense, (2) some contested fact separates

-15-

the two offenses, and (3) given the evidence, a jury could rationally find the defendant guilty of the lesser offense while acquitting him of the charged offense.  United States v. Boidi, 568 F.3d 24, 27 (1st Cir. 2009).  Here, items (1) and (2) are uncontested – (1) a charge that Place should have known his trafficking was illegal is necessarily included in the charge that Place actually knew his trafficking was illegal, and (2) Place's state of mind is contested – he is adamant that he lacked actual knowledge.  The only issue is (3) whether a rational jury could have agreed with Place and found that he indeed lacked actual knowledge that his whale-tooth transactions were illegal.

Place says the jury could have believed his attested-to ignorance notwithstanding years of emails demonstrating knowledge; the government says the emails and other circumstantial evidence – receiving tipoffs from friends; disguising the contents of packages on customs forms; creatively routing those packages to evade customs; having myriad whale-tooth auctions shut down on eBay; reading the content of those eBay shutdown notices, which informed him of the broad CITES requirements – overwhelmingly prove actual knowledge.  The government has the better of this argument.

Place's emails (which acknowledged that the teeth required permits to be legal and admitted buying and selling without the permits) directly prove knowledge that his transactions were illegal; his testimony at trial echoes the emails; he took steps to

-16-

hide his transactions from authorities; he repeatedly suggested that these steps would help him avoid a criminal investigation or prison time; and the only contrary evidence is a set of post hoc, self-serving statements that he believed his transactions were exempt from CITES because the teeth he sold were old, scrimshawed, or Inuit in origin. His own emails, testimony, and conduct, though, belie the validity of that purported belief. No reasonable jury could have accepted his testimony and rejected the mountain of evidence that Place knew his conduct was illegal; therefore, Place was not entitled to a lesser-included Lacey Act instruction.

## B. Smuggling Conviction

Place's other argument assails his convictions on Counts 8 (smuggling sperm whale teeth) and 9 (smuggling narwhal tusks); he says the smuggling statute does not criminalize violations of regulations like those implementing CITES. Specifically, he says the smuggling statute, which does criminalize violations of some non-criminal laws, is ambiguous; that a comparison to other laws shows Congress knows how to penalize regulatory violations when it wants to, but it did not do so here; and that in any event, the rule of lenity counsels that we should resolve the statute's ambiguity in his favor. The government makes various counter-arguments; we will address each of Place's and the government's arguments in turn. This smuggling-statute issue is one of statutory interpretation that we review de novo. United States v.

<u>Godin</u>, 534 F.3d 51, 56 (1st Cir. 2008).

We start with a more detailed review of the smuggling statute. The statute imposes criminal sanctions on anyone who "receives, conceals, buys, [or] sells . . . merchandise after importation, knowing the same to have been imported or brought into the United States contrary to law . . . ." 18 U.S.C. § 545. As we have said, the phrase "contrary to law" means that the smuggling statute criminalizes conduct that may be illegal under other sources of law but is not necessarily criminal according to those sources' own terms. For example, in 1999 we considered a sentencing appeal where the underlying conviction was for smuggling freon into the United States from Canada: the Clean Air Act imposed permitting requirements that the defendant had violated, and the smuggling statute rendered these violations criminal. See <u>United States</u> v. <u>LeBlanc</u>, 169 F.3d 94, 94-95 (1st Cir. 1999). That case involved the smuggling statute's criminalizing a violation of a statute, and this (criminalizing statutory violations) is apparently its most common application; in this case, though, the question is whether the smuggling statute may similarly criminalize violations of the regulations like those implementing CITES.[10] This question hinges

---

[10] A refresher: CITES is directly, but only broadly, implemented in the United States by the ESA, 16 U.S.C. §§ 1537A, 1538(c)(1); the ESA also authorizes the Secretary of the Interior to promulgate CITES-based regulations, <u>id.</u> § 1537; Interior has in fact issued regulations that mirror the language of CITES, 50 C.F.R. §§ 23.1-23.92; and these regulations impose, e.g., permitting requirements, <u>id.</u> §§ 23.12(a), 23.15 (2004), and a ban

-18-

on whether Congress intended that the statutory word "law" be limited to statutory law or whether Congress meant for the word to include regulatory law as well.

First, Place says the word "law" has many meanings, any of which Congress could conceivably have been employing in the smuggling statute. "Law" is indeed a broad word with many meanings, including, most notably for our purposes, "[t]he aggregate of legislation, judicial precedents, and accepted legal principles; the body of authoritative grounds of judicial and administrative action." Black's Law Dictionary (9th ed. 2009). Then again, "law" may also be defined as narrowly as "a statute" (though in the latter case the word generally appears with an article, e.g. "Congress passed **a** law").[11]  Id.  Given these

------

on international trade in Appendix I species for "primarily commercial purposes," id. § 23.15(d)(7).  CITES's domestic structure means that its specific requirements are generally contained in its regulations, not in the ESA.  And Place was convicted of smuggling whale teeth into the United States without the documentation required by these regulations.

[11] Here is Black's Law Dictionary's full definition of "law":

1. The regime that orders human activities and relations through systematic application of the force of politically organized society, or through social pressure, backed by force, in such a society; the legal system <respect and obey the law>. 2. The aggregate of legislation, judicial precedents, and accepted legal principles; the body of authoritative grounds of judicial and administrative action; esp., the body of rules, standards, and principles that the courts of a particular jurisdiction apply in deciding controversies brought before them <the law of the land>. 3. The set of rules or principles dealing with a specific area of a legal system

-19-

differing definitions, we must try to discern what Congress actually meant when it used the word "law" in the smuggling statute.

Place argues that Congress meant only for the narrowest definition of "law" – "a statute" – to apply here; the government responds that the Congress more likely intended "law" to have its much more common, broad meaning – one that includes regulations. In fact, the government points out, the Supreme Court has said that the analogous phrase "authorized by law" plainly includes at least some regulations, see Chrysler Corp. v. Brown, 441 U.S. 281, 295-96 (1979) ("[i]t would . . . take a clear showing of contrary legislative intent before the phrase 'authorized by law' . . . could be held to have a narrower ambit than the traditional understanding" – an understanding that "law" encompasses regulations). And, the government concludes, every circuit court to have considered the question in the context of the smuggling statute has likewise agreed that "contrary to law" similarly includes at least some regulations, see United States v. Alghazouli, 517 F.3d 1179, 1183 (9th Cir. 2008); United States v. Mitchell, 39 F.3d 465, 468-70 (4th Cir. 1994); Estes v. United

<copyright law>. 4. The judicial and administrative process; legal action and proceedings <when settlement negotiations failed, they submitted their dispute to the law>. 5. A statute <Congress passed a law>. — Abbr. L. 6. common law <law but not equity>. 7. The legal profession <she spent her entire career in law>.

States, 227 F. 818, 821-22 (8th Cir. 1915) (interpreting an older version of the smuggling statute that even then contained the phrase "contrary to law").[12] The government puts on a persuasive case: the word "law" is much more commonly understood to include regulations, so Place has a steep climb before he can show that Congress intended a narrower reading.

Place's next argument attempts to accomplish this climb by comparing the smuggling statute with certain other statutes – most notably, 18 U.S.C. § 554 (titled "Smuggling goods from the United States"). Enacted years after § 545, § 554 includes the phrase "contrary to law or regulation," which Place insists shows that

---

[12] Place does not raise the question whether the word "law" may include some regulations but exclude others. Nor does he raise the issue of which regulations the word "law" might include, an issue on which other circuits have taken potentially conflicting stances. Compare Alghazouli, 517 F.3d at 1187 (holding that "[t]he term includes a regulation only if there is a statute (a 'law') that specifies that violation of that regulation is a crime"), with Mitchell, 39 F.3d at 469 (holding that the term includes "regulations having the force and effect of law," with no discussion of whether violation of these regulations need independently amount to a criminal offense). And, finally, Place does not argue that if the word "law" indeed does include at least some regulations, it nevertheless excludes the CITES implementing regulations.

Instead, Place has presented the issue as an all-or-nothing proposition: he says simply that "[t]he district court erred by instructing the jury that regulatory violations were sufficient to establish guilt." In fact, he goes further and asks us to reject the Ninth Circuit's efforts in Alghazouli to distinguish among different types of regulations for purposes of determining which are "law," suggesting we simply declare that no regulations are "law." Absent nuanced argument on this delicate point that has split our sister circuits, we consider the argument as Place has presented it and say only that some regulations are "law," including those implementing CITES.

Congress does not generally intend the word "law" to include regulations. After all, the disjunctive "or" can only mean that "law" and "regulation" are two wholly different concepts – or so Place argues. But "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one," Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 117-18 (1980) (quoting United States v. Price, 361 U.S. 304, 313 (1960)), and section 554 was enacted well over a hundred years after the original version of the smuggling statute (from which the phrase "contrary to law" has been passed along through several generations). See Mitchell, 39 F.3d at 469 (tracing the smuggling statute's history). The addition of the words "or regulation" to the phrase "contrary to law" in later statutes perhaps reflects no more than Congress's attempt to head off the type of argument made here; it certainly does not suggest that "contrary to law" should exclude regulations. If anything, in fact, subsequent legislative history tells us the opposite: we presume Congress is aware of judicial interpretations of existing statutes when it passes new laws, Lorillard v. Pons, 434 U.S. 575, 580 (1978), and in reenacting the smuggling statute multiple times Congress has never sought to exclude regulations despite almost a century of circuit-court precedent holding that the word "law" in the statute includes regulations.

Finally, Place argues that we should apply the rule of lenity

to exclude regulations from the ambit of the word "law" in the smuggling statute.  The rule of lenity counsels that ambiguities in criminal statutes should be resolved in a defendant's favor.  See Godin, 534 F.3d at 60-61.  But, again, the most common meaning of the word "law" is quite broad, and for that reason the Supreme Court has said only "a clear showing of . . . legislative intent" can overcome the "traditional understanding" that "law" encompasses regulations.  Chrysler Corp., 441 U.S. at 295-96.  There is simply no indicator of any legislative intent that the smuggling statute applies as narrowly as Place would have us read it.  Given the absence of any textual or contextual clues that the smuggling statute should be narrowly construed, Place's smuggling conviction is substantively appropriate.[13]

### III. Wrapping up

After ruminating on the whale's possible extinction, Melville's Ishmael eventually "account[ed] the whale immortal in his species, however perishable in his individuality."  The United States and most other countries, however, have made a contrary judgment and decided to use what legal tools they can to eliminate the international market for whale parts so the species may survive

---

[13] Because we hold that Place's CITES-noncompliant imports were "contrary to law," we need not consider the government's argument (raised only briefly in a footnote) that the same conduct was also "contrary to" the ESA, which is plainly "law."

and flourish.[14]   Place was charged, fairly tried, and properly convicted for knowingly flouting these laws and the regulations implementing them.   Rejecting his arguments on appeal for the reasons set forth above, we now **affirm** these convictions in full.

---

[14] For example, the preamble to CITES says "that international co-operation is essential for the protection of certain species of wild fauna and flora against over-exploitation through international trade"; CITES art. II says that Appendix I species like the sperm whale "must be subject to particularly strict regulation in order not to endanger further their survival"; and, moving on from the treaty, 16 U.S.C. § 917 includes congressional findings that "whales have been overexploited by man for many years, severely reducing several species and endangering others" and that "the conservation and protection of certain species of whales, including the . . . sperm . . . whale, are of particular interest to citizens of the United States."